BOIES, SCHILLER & FLEXNER LLP
Kevin J. Barry (CA Bar No. 229748)
kbarry@bsfllp.com
1999 Harrison Street, Suite 900
Oakland, CA 94612
Phone (510) 874-1000
Fax (510) 874-1460
Attorney for Plaintiffs

COPY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

2008 MAR -4  AM 11:43   FILED

| | |
|---|---|
| Jessica Monugian, Michael Gonzales, Kathleen Janiec, Gerald Wolke, Feng Yan Wolke, James Almond, Anna Almond,<br><br>Plaintiffs,<br><br>v.<br><br>Desarollo Marina Vallarta S.A. de C.V.; El Grupo Mayan Palace; Daniel Chavez Moran; Daniel Omar Chavez; Scott R. Erikson; Casey Jon Owens; Canamere, Inc.; Huffsmith-Kohrville, Inc.; Preferred Vacations, Inc.; Premium Travel Services, Inc.; Resort Solutions, Inc.; Seven Oceans US, Inc.; AZM Marketing, LLC; Resort Quality Controls, Inc.; Resort Condominiums International, LLC; and Resorts International Marketing Corp.,<br><br>Defendants. | Civil Action No. _____<br><br>CV08-01497 GAF AJWx<br><br>**COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL** |

1

2

3          Jessica Monugian and Michael Gonzales, Kathleen Janiec, Gerald and Feng

4    Yan "Amber" Wolke, and James and Anna Almond (together "Plaintiffs"), by their

5    attorneys, Boies, Schiller & Flexner LLP and Heard, Robins, Cloud & Lubel LLP,

6    bring this action under Title 18 of the United States Code, Section 1961, et seq., the

7    Racketeer Influenced and Corrupt Organizations Act ("RICO") and California state

8    law, seeking monetary and injunctive relief against Desarollo Marina Vallarta S.A.

9    de C.V.; El Grupo Mayan Palace; Daniel Chavez Moran; Daniel Omar Chavez;

10   Scott R. Erikson; Casey Jon Owens; Canamere, Inc.; Huffsmith-Kohrville, Inc.;

11   Preferred Vacations, Inc.; Premium Travel Services, Inc.; Resort Solutions, Inc.;

12   Seven Oceans US, Inc.; AZM Marketing, LLC; Resort Quality Controls, Inc.;

13   Resort Condominiums International, LLC; and Resorts International Marketing

14   Corp. (collectively "Defendants") for Defendants' unlawful conduct, as follows:

15

16                              **NATURE OF ACTION**

17          1.     This case concerns a conspiracy operating and managing resorts in

18   Mexico – using the name Mayan Resorts – which has bilked U.S. citizens out of

19   hundreds of millions of dollars through the use of high pressure fraudulent sales

20   tactics that are comparable to the worst tactics ever employed by used car salesmen

21   in a Hollywood movie.  Every day, Defendants and their agents lie to innocent

22   victims by telling vulnerable Class Members that there is a valuable rental market

23   for timeshare properties at Mayan Resorts and that they are therefore appropriate

24   for investment rather than simply as a vacation destination.  Defendants earn

25   hundreds of millions each year from such sales by systematically misrepresenting

26   in sales presentations and documents the value of the timeshares they are selling.

27   Defendants as part of their scheme also have misled Plaintiffs as to their rights

28   under Mexican law.

2.    Defendants also fail to disclose to their victims that the market prices for timeshares being sold at Mayan Resorts are much much less than the prices paid for them by Class Members, that no rational investor would purchase such a timeshare as an investment, and that purchasers are signing documents purporting to waive rights that are not waivable.  Through such sales, Class Members have been duped into investing savings reserved for their children's education, for retirement, and for family security into what is a virtually worthless investment.

3.    Mayan Resorts operates "Sea Gardens," "Mayan Palace," and "Grand Mayan" resorts at multiple locations in Mexico.  The resorts are popular vacation spots, and if Mayan Resorts limited itself to selling timeshares at its resorts for purposes of vacation, this case would not be brought.  Defendants, however, have developed sophisticated and illegal sales techniques to trick countless U.S. consumers to *invest* in Mayan Resorts timeshares while believing they have waived their rights to contest such fraud.  Salespeople for Mayan Resorts are instructed to and do misrepresent to potential customers the "average net rental return" for the timeshares, which represents the rents received for the timeshares after payment of maintenance fees.  Salespeople are instructed to and do write these promised rents by hand for each customer (but, as instructed by Mayan Resorts, do not provide a copy to the customers).  Mayan Resorts sales personnel sell numerous timeshare weeks (2, 4 and 8 weeks annually for a 25 year or longer period) based on the asserted investment quality of the timeshares and the asserted rental value of the timeshare weeks.  Salespeople then have customers sign contracts falsely disavowing the investment purpose of the purchase and purporting to waive unwaivable rights.

4.    Despite complaints about their sales operation, Defendants last year hired a new head of training for their sales operation fresh from his release from U.S prison, where he served a sentence for timeshare fraud – only to see him arrested again.

3

5. Although the truth is never disclosed to potential buyers, in truth, there is no rental market for these units and it is difficult to rent them for even enough to cover the annual maintenance fee. The units are available for resale on the Internet for 15 to 20% of the original purchase price or less. Nonetheless, Defendants are participating in a wanton criminal scheme to sell these timeshares as investments to individuals who need these investments for college funds, retirement, and future living expenses.

## PARTIES

**Jessica Monugian and Michael Gonzales**

6. Plaintiffs Jessica Monugian and Michael Gonzales are United States citizens who at all material times resided in Whittier, CA, in Los Angeles County. On October 22, 2006, while in Mexico, Monugian and Gonzales together purchased a "red week" timeshare in a 2-bedroom unit at Mayan Palace Regency Riviera Maya for $19,120, and paid a deposit of $4,780.

7. That day, Monugian and Gonzales were told by two separate salespeople that to get the "special price" they were quoted, they were required to waive their right to cancel the contract within five business days.

8. On October 24, 2006, Monugian and Gonzales called their salesperson and told him they wanted to cancel their purchase. They also called and left messages, all unreturned, in November 2006 and on January 23 and February 28, 2007. On March 5, 2007, a Mayan Resorts representative called them in California and told them that if they were to cancel their purchase, they would lose their deposit.

9. On March 25, 2007, a Mayan Resorts representative called them in California and confirmed to them that their contract was cancelled, but that Mayan Resorts would not return their deposit.

**Kathleen Janiec**

10. Plaintiff Kathleen Janiec is a United States citizen who at all material times resided in Mission Viejo, CA, in Orange County. On June 26, 2006, while in Mexico, Janiec purchased a "red week" timeshare in a 1-bedroom unit at Mayan Resorts' Puerto Vallarta location for $13,900, and paid a deposit of $4,170.

11. On or about August 6, 2006, from her home in California, Kathleen paid $299 by credit card to Defendant Resorts International Marketing Corp. ("RIM") to list her Mayan Resorts timeshare for rent. Neither RIM nor Janiec has ever rented out Kathleen's unit.

12. Janiec paid $519.95 in maintenance fees to Mayan Resorts by credit card from her home in California.

**Gerald and Feng Yan ("Amber") Wolke**

13. Plaintiffs Gerald and Feng Yan "Amber" Wolke are United States citizens who at all material times resided in Vallejo, CA, in the county of Solano. On or about June 20, 2006, while in Mexico, the Wolkes agreed to purchase a "red week" timeshare in a 2-bedroom Grand Master Suite at Mayan Resorts' Grand Mayan Riviera Maya location for $32,496, and paid a deposit of $11,374.

14. The Wolkes attempted to cancel their purchase contract the next morning, but were told that if they did, they would lose their $11,374 deposit.

15. On or about June 24, 2006, from their home in California, the Wolkes paid $299 to Defendant RIM to list their Mayan Resorts timeshare for rent. Neither RIM nor the Wolkes have ever been able to rent the Wolkes' unit.

16. On or about July 20, 2006, from their home in California, the Wolkes paid the $21,122 balance due to Mayan Resorts by credit card.

17. On October 18, 2006 and February 19, 2007, the Wolkes wrote from their home in California to Mayan Resorts attempting to cancel the purchase contract. Mayan Resorts refused to cancel the purchase contract.

18.     The Wolkes paid $800.31 in maintenance fees to Mayan Resorts by credit card from their home in California.

**James and Anna Almond**

19.     Plaintiffs James and Anna Almond are United States citizens who at all material times resided in Elk Grove, CA, in the county of Sacramento.  On February 12, 2005, while in Mexico, the Almonds purchased a "red week" timeshare in a 1-bedroom Mayan Palace unit at Mayan Resorts' Puerto Vallarta location for $15,400, and paid a deposit of $4,900.  On or about November 15, 2005, while in Mexico, they upgraded to a one week per year timeshare in a 2-bedroom unit at Mayan Resorts' Grand Mayan Cancun location for an additional $15,700.

20.     On February 12, 2005, representatives of Mayan Resorts told the Almonds that if they attempted to cancel their purchase contract, they would lose their deposit of $4,900.

21.     On or about January 2, 2006, from their home in California, the Almonds paid $299 by credit card to Defendant RIM to list their Mayan Resorts timeshare for rent.  Neither RIM nor the Almonds have ever rented out the Almonds' unit.

22.     On February 5, 2007, the Almonds wrote from their home in California to Mayan Resorts, attempting to cancel their purchase contact.  Mayan Resorts never responded to this letter.

23.     The Almonds have paid $5,698 in maintenance fees to Mayan Resorts by credit card from their home in California.

**Defendants**

24.     Defendant Desarollo Marina Vallarta S.A. de C.V., which does business under the name "Mayan Resorts," is, and at all material times was, a corporation organized under the laws of Mexico, with its U.S. headquarters in

Houston, Texas and place of business in Guadalajara, Jalisco, Mexico.  It is also known as Grupo Vidafel and Vidafel Resorts.

25.    Defendant El Grupo Mayan Palace ("Mayan Palace") is a company organized under the laws of Mexico.  It is the owner of Mayan Resorts with its U.S. headquarters in Houston, Texas.  Defendant Mayan Palace also does business under the name Grupo Vidafel.

26.    Defendants Daniel Chavez Moran ("Daniel Chavez") is an individual who resides in Mexico and Arizona.  Defendant Moran is and was, at relevant times, the President, CEO and majority shareholder of Mayan Resorts and Mayan Palace.

27.    Defendant Daniel Omar Chavez ("Daniel Omar") is and was, at relevant times, an officer or director of Mayan Resorts and its affiliates.  He is a resident of Tempe, Arizona.

28.    Defendant Scott R. Erikson was, at relevant times, an employee of Mayan Resorts and an officer and director of affiliates of Mayan Resorts.  He resides in Coolleyville, Texas.

29.    Defendant Casey J. Owens was Director of Sales for Mayan Resorts until April 2006 and was, at relevant times, an officer and director of Mayan Resorts affiliates.

30.    Defendant Canamere, Inc. is a corporation organized under the laws of Texas, with its principal place of business in Houston, Texas, where it operates a call center.  Defendant Daniel Chavez is the President of Canamere.  Mayan Resorts represents and promotes the Houston offices of Canamere as the U.S. headquarters of Mayan Resorts, and answers the telephone using the Mayan Resorts name.  The phone number for the call center is also listed at www.mayanresorts.com as the contact number for Mayan Resorts in the United States.  Defendant Canamere also does business as Vidafel Reservation Center and Defendant Preferred Vacations, Inc.

31.    Defendant Huffsmith-Kohrville, Inc., formerly HK Construction, is an affiliate of Mayan Resorts and is controlled by Daniel Chavez.  It is a corporation organized under the laws of Texas, located in Tomball, Texas and Houston, Texas. It purchases property for Daniel Chavez's group of companies and invests the proceeds of Defendants' fraud.  It shares a phone number and offices with the Mayan Resorts headquarters operated by Canamere in Houston.  Its mailing address is Scott Erikson's home address.

32.    Defendant Preferred Vacations, Inc. is an affiliate of Mayan Resorts and is controlled by Defendant Daniel Omar.  It is a corporation organized under the laws of Texas, and is based in the offices of, and shares a phone number and address with, the Mayan Resorts headquarters operated by Canamere in Houston. Defendant Daniel Omar is its President and Director.   "Preferred Vacations, Inc." is also an assumed name of Defendant Canamere, Inc.

33.    Defendant Premium Travel Services, Inc. ("PTS") is an affiliate of Mayan Resorts and is controlled by Defendant Daniel Chavez.  It is, and at relevant times was, a corporation organized under the laws of the state of Texas, with its principal place of business in Houston, Texas.  Defendant Scott Erikson is its registered agent.

34.    Defendant Resort Solutions, Inc., is an affiliate of Mayan Resorts and is controlled by Daniel Chavez.  It is a corporation organized under the laws of the state of Nevada with its principal place of business in Scottsdale, Arizona.  It is also incorporated as a foreign corporation in Arizona.  Casey Owens was, at relevant times, its President, CEO and Treasurer.

35.    Defendant Seven Oceans US, Inc. ("Seven Oceans") is an affiliate of Mayan Resorts and is controlled by Daniel Omar.  It is a corporation organized under the laws of the state of Arizona with its principal place of business in Phoenix, Arizona.  Daniel Omar is its sole shareholder.

8

36.     Defendant Resort Quality Controls, Inc. ("RQC") is an affiliate of Mayan Resorts and is controlled and owned by Daniel Chavez.  It is a Texas corporation located in Houston, Texas.  RQC advertises for employees for the Houston call center with resumes to be sent to www.mayanresorts.com or www.greatvacationsclub.com.  Defendants Canamere, RQC, PTS, and Huffsmith-Kohrville all share the same office suite in Houston, TX.

37.     Defendant AZM Marketing, LLC ("AZM") is an affiliate of Mayan Resorts and is controlled by Daniel Omar.  It is a corporation organized under the laws of the state of Arizona with its principal place of business in Fountain Hills, Arizona.  Scott Erikson is its manager and Casey Owens is a member.

38.     Defendant Resorts Condominiums International, LLC ("RCI") is a subsidiary of Group RCI, which is a subsidiary of Wyndham Worldwide Corporation.  RCI is a limited liability company with its principal place of business in New Jersey.  It handles timeshare rentals for timeshare owners and, with knowledge of the fraud that has been committed, refers victims of the fraud to Mayan Resorts in order to receive revenue share payments.

39.     Defendant Resorts International Marketing Corp. ("RIM") is a Florida corporation with its principal place of business in Florida.  It handles timeshare rental and resale for timeshare owners.  It operates the website vacationweeks.com and is also known as "Vacation Weeks."  The Better Business Bureau gives RIM an "F," its lowest grade, indicating that the Bureau "strongly question[s] the company's reliability for reasons such as that they have failed to respond to complaints, their advertising is grossly misleading, they are not in compliance with the law's licensing or registration requirements, their complaints contain especially serious allegations, or the company's industry is known for its fraudulent business practices."

40.     The individual and corporate defendants are persons within the meaning of 18 U.S.C. § 1962.  Defendants listed in paragraphs 24 to 37 of this Complaint are hereinafter referred to as the Mayan Resort Defendants.

## CO-CONSPIRATORS

41.     Felipe de Jesus Ramirez Guttierrez is the Managing Director of Mayan Resorts, reporting directly to Daniel Chavez.  Ramirez is also a Director of PTS, Vice President of RQC, and Vice President of Canamere.

42.     Vincenzo (Enzo) Nudo, Linda (Bama) Brasseal, and Franny Nudo are all employees of Mayan Resorts.

43.     The following are shareholders and members of the Board of Administration of Mayan Resorts: Alma Lydia Solis de Chavez, the wife of Daniel Chavez and President of Mayan Resorts; Jesus Raul Chavez Escarega, Secretary of Mayan Resorts; Maria Elenea Mendoza Cedeno de Chavez, Treasurer of Mayan Resorts; Adriana Maria Rodriguez de Chavez, the wife of Jesus Raul Chavez; and Ricardo Chavez Moran.

44.     Hoteles Dinamicos, S.A. de C.V., is a corporation organized under the laws of the state of Mexico with its principal place of business in Guadalajara, Mexico.  It is an affiliate of Mayan Resorts and is controlled by Daniel Chavez.  It owns and operates airplanes for the use of the Enterprise, using funds invested by the Enterprise.

45.     Dean F. D. Lane and Wonderland Motivations, Ltd. are the authors of a Mayan Resorts sales training manual.

46.     Michael Kelly, recently released from prison having served time for fraud related to the sale of timeshares (and the proprietor of a Mexican company called "Jerking Off" which sells t-shirts emblazoned with the words "Come jerk off with us"), was recently hired by Chavez to lead timeshare sales training at Mayan. In the two months after Kelly joined Mayan in November 2006, sales of timeshares

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

doubled.  In late December 2006, Kelly was arrested for running a $400 million

pyramid scheme using many of the same tactics described herein.  In September

2007, the SEC filed a separate complaint against him.  He is being held without bail

and faces a possible life sentence.  *See USA v. Kelly*, #1:06-cr-00964-1 (N.D. Ill.

filed Dec. 22, 2006).

## JURISDICTION AND VENUE

47.     This action is brought pursuant to the federal RICO statute, 18 U.S.C.

§ 1961, et seq.; California's Business and Professions Code § 17200, et seq. and §

17500, et seq.; principles of common law fraud, fraud in the inducement, civil

conspiracy to defraud, the duty of good faith and fair dealing, negligence, gross

negligence, negligent misrepresentation, and grossly negligent misrepresentation.

48.     This Court has subject matter jurisdiction over Plaintiffs' claims under

28 U.S.C. §§ 1331 and 1332(a)(1)-(2).

49.     This Court has personal jurisdiction over Defendants, and venue is

proper, under 18 U.S.C. § 1965(a); 28 U.S.C. § 1391(b), (c), and (d); and the

California long arm statute, Cal. Civ. Proc. Code § 410.10.  Plaintiffs reside in this

district, and Defendants all transact business affairs in this District.  Defendants are

engaged in commerce in California, and a substantial part of the events giving rise

to the claims for violations of California law occurred here.  Defendants did

business in California at all times relevant hereto, operated their businesses

continuously in California, and specifically targeted residents of the state of

California.  Each of the Defendants has caused harm to the general public of

California and their actions threaten to cause future harm to the general public of

California absent an injunction.

50.     Approximately 85 percent of the purchasers of the Mayan Resort

timeshares are from the United States.  After an initial deposit, all payments from

U.S. customers are directed to a bank account in Dallas, Texas pursuant to

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

1  instructions from Mayan Resorts which state: "Monthly payments should be

2  remitted to Desarollo Marina Vallarta, P.O. Box 911841, Dallas, TX 75391-1841."

3  The customer service center used by Mayan Resorts is located in Houston Texas.

4  Amendments to the contract, such as the addition of names to the contract, are also

5  directed to Houston.

6      51.    Payments by purchasers in California and this District are

7  transmissions from the homes of Class Members by credit card, wire or check.

8      52.    Calls to the customer service center are regularly made from California

9  and this District.

10     53.    Contract amendments executed by residents of California and this

11  District are transmitted from their homes to the customer service center.

12     54.    Class Members who reside in California and this District have listed

13  their timeshares for rent with Defendant RIM as a result of their purchases of

14  timeshares from Mayan Resorts.  These Class Members have also made payments

15  by credit card and check from their homes in California and this District to RIM.

16  RIM also markets its services to customers in California and this District and sells

17  and rents numerous properties in California and this District.

18     55.    Class Members, who reside in California and this District, have

19  transacted business with Defendant RCI as a result of their purchases of timeshares

20  from Mayan Resorts.  These Class Members have made payments by credit card or

21  check from their homes in California and this District to RCI.  RCI also markets its

22  services to customers in California and this District and sells and rents numerous

23  properties in California and this District.

24     56.    Mayan Resorts maintains an interactive website through which Mayan

25  markets its products to California residents.  The Mayan Resorts website describes

26  the "Vacation Club" and invites California residents to "come to visit."  The

27  website also allows Vacation Club "members" to make on-line reservations.

28  Approximately 15% of the Vacation Club memberships sold by Mayan Resorts are

12

1  sold to California residents.  As a result, California residents send millions of

2  dollars annually, either in the form of time share payments or maintenance fees, to

3  the Mayan Resorts account in Dallas, Texas.

4

5                              **BACKGROUND**

6       57.    Mayan Resorts offers a vacation plan in which members purchase

7  timeshares – weekly lodging rights to rooms at Mayan Resorts.  Mayan Resorts

8  operates "Sea Gardens," "Mayan Palace," and "Grand Mayan" resorts at seven

9  locations in Mexico.

10 **Mayan Resorts Timeshares**

11      58.    The Mayan Resorts vacation plan is called the Grand Mayan Vacation

12 Club ("Vacation Plan").  Under the Vacation Plan, a member purchases lodging

13 rights and services for a specified number of weeks for rooms at any of Mayan

14 Resorts' properties.  Mayan Resorts agrees to provide lodging and services to an

15 agreed-upon type of unit during a designated period of time of the year.  The unit

16 can be a two-bedroom-two bath suite (Master Suite), a one-bedroom-one bath suite

17 (Suite), or a room without a kitchen (Master Room).  The right to use the unit is

18 purchased by the week, and Mayan Resorts and the member agree upon the total

19 number of weeks.  The services may include privileges to Mayan Resorts' golf

20 courses, gyms and spas, and tennis courts.

21      59.    Weeks purchased under the Vacation Plan are called Registered

22 Weeks.  During Registered Weeks, a member is entitled to lodging and service

23 rights at one of Mayan Resorts for the agreed-upon number of weeks per year.

24 Each Registered Week purchased requires payment of a yearly maintenance fee.

25 For each Registered Week purchased, a member is also entitled to a bonus week per

26 year called a Vacation Fare Week.  Thus, if a member purchases three weeks, the

27 member pays a maintenance fee for three Registered Weeks.  The member also

28

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

1   receives three Vacation Fare Weeks, but pays a maintenance fee only if the

2   additional weeks are requested and confirmed.

3          60.    As part of the Vacation Plan, Mayan Resorts and its members contract

4   for a period of the year during which a member can use their Registered Week and

5   Vacation Fare Week.  The classifications of the periods for the Registered Weeks

6   are Elite Weeks, Red Time, and White Time.  Elite Weeks can be used any time of

7   the year, including the weeks of Christmas, New Years, Holy Week, and Easter

8   ("Holiday Weeks"); Red Time is any time of the year except the Holiday Weeks;

9   and White Time weeks are the weeks in June through September.

10         61.    Prospective purchasers ("Prospects") are obtained by on-line

11  interactive solicitations and by solicitors that invite tourists from the airports and

12  streets of the cities in which Mayan Resorts has properties.  In addition,

13  presentations are offered to those staying at the Mayan Resorts either as timeshare

14  sub-renters or as "hotel" guests.  The Prospects are told that the presentation will

15  take 90 minutes and are offered incentives such as free breakfast, room upgrades,

16  free local tours, and free golf for attending.

17         62.    Mayan Resorts also shares revenues from Vacation Plan sales with

18  certain referral companies, including Defendant RCI.  Mayan Resorts pays millions

19  of dollars annually to RCI for referrals of timeshare customers.

20         63.    RCI, through its operations, knows that there is no market for the

21  rental of the Mayan Resorts Vacation Plan timeshares.   RCI knowingly refers

22  Prospects to Mayan Resorts only because of the lucrative revenue sharing that

23  Mayan Resorts offers RCI to participate in an ongoing fraudulent scheme.

24         64.    RCI does not disclose to its customers, despite its knowledge of such

25  facts, either that there is no rental market for the timeshares or that no rational

26  investor would purchase a timeshare from Mayan Resorts as an investment.

27

28

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

65.     Proceeds from the fraud perpetrated on Plaintiffs and other victims are laundered through, *inter alia*, Defendants Canamere, Huffsmith-Kohrville, PTS, Preferred Vacations, Resort Solutions, Seven Oceans, AZM and RQC.

**The Fraudulent Scheme**

66.     Defendants' sales presentations are based on a standard sales process tightly controlled by Defendants: a one minute rehearsal of a greeting, the greeting of the Prospect, warming up the Prospect, presenting of an agenda, discovery of information about the Prospect, breakfast, a property tour, a membership presentation about the resorts, a discussion of value including resale and rentals, a summary of features and benefits, taking the temperature of the Prospect on a scale from one to ten and ranking of the top three things that the Prospect liked most. Sales training materials advise that it is very important to "**follow the exact sequence listed above.**"  The Prospect thus meets with the salesperson, who remains with the Prospect throughout the sales process.  The process begins with breakfast or lunch, and is followed by a tour of the property.  The Prospect is then taken to the sales table.

67.     The Mayan Resort Defendants exercise control over the sales process by the use of standard training materials and techniques; the use of standard misleading documents shown to Class Members; and standard false and misleading form contracts.

68.     Initially, all salespeople are trained on how to do the sales presentation and how to overcome objections.  In addition, all salespeople are provided with a "Training Package."  The Training Package provides detailed instructions on how to sell the timeshare units and instructs the salesperson that "THE MONEY IS IN THE DETAILS."  The Training Package is intended to, and does, assure that each Prospect receives a uniform sales pitch.

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

69.     The Training Package includes illustrations on how to sell the units as "investments" and how to use "discounts" and "credits" to convince Prospects that they have waived their right to cancel.

70.     If at any time it appears that the Prospect is going to leave without purchasing, the salesperson will call in a sales manager to help close the deal.  The sales manager will often work through, or rework, investment numbers, or offer additional discounts, incentives or credits.

71.     Once the Prospect agrees to purchase, a worksheet is filled out which requests credit card and financial information, as well as the details of the unit purchased.  The credit card that the Prospect provides for the down payment is charged, and the formal contract is created.  The Prospect and the contract are then brought to the "VLO."  The Training Package gives the salesperson specific instructions on how to hand off to the VLO.

72.     It is the job of the VLO to verify the terms of the contract with the prospect.  As with the salespeople, all VLOs are trained to perform the contract review in a uniform manner.

73.     If a Prospect attempts to cancel after the contract is signed, the Prospect is referred back to the VLO.  Under Mexican law, the purchaser of a timeshare may cancel a timeshare purchase contract within five business days of signing the contract; they may do so either in person *or* by registered mail or other reliable means; and the right to cancel cannot be waived.  Prospects are nonetheless told that they have waived the right to cancel and will lose the deposit if they do so.  Class Members' contracts falsely state that to cancel they must, within five days, "return[] all documentation to the member service representative at the resort *with all signees being present*, *and* (B) send[] written notification by certified mail . . . ." (italics added).  Purchasers, unaware that the five business day cancellation period cannot be waived, when threatened with the loss of deposit (usually equal to at least one third of the purchase price) often do not pursue cancellation.  Others who

16

1   attempt to return their documentation find that the required sales representative is

2   never available.  Even those who do cancel wrongfully lose their deposits.

3

4                       **DEFENDANTS' FRAUDULENT ACTS**

5           74.     Mayan Resorts engages in two principal types of affirmative

6   misrepresentations: first, Defendants and their agents misrepresent timeshare units

7   for which there is no viable market as valuable "investments," and second,

8   Defendants and their agents misrepresent the right of purchasers to cancel the sale

9   within five business days as provided for under Mexican law.  Further, Defendants

10  mislead and misrepresent by omission and concealment.  Defendants do not

11  disclose and instead conceal that timeshares being sold have market value much

12  less than the purchase price and only limited rental value.  If these facts were

13  disclosed, Class Members would not purchase the timeshares in question.  The

14  Mayan Resorts Defendants further do not disclose and conceal that Class Members

15  have a non-waivable right to cancel their purchases within five business days.

16  **A.    False Statements Regarding the Investment Value of the Timeshare
         Units**
17

18          75.     The sales presentations by Mayan Resorts salespeople misrepresent the

19  timeshares as an "investment" by stating that a timeshare unit will pay for itself,

20  and indeed be a profitable source of income.  Specifically, the presentation includes

21  illustrations of how the Prospect can utilize half of the weeks in the Vacation Plan,

22  and rent out the other half of the weeks, the income from which will cover the

23  maintenance fees for the entire unit and provide additional profit.  (Prospects are

24  told that they can "pay yourself to go on vacation with your family.")  These

25  misrepresentations have been made on a daily basis during the class period.

26          76.     The sales personnel are instructed by the training materials to write

27  projected rentals on notepads, called "Yellow Sheets," to demonstrate that the

28

rentals will cause the purchases to pay for themselves.  The Yellow Sheets are also used to encourage Prospects to purchase more than one unit as investments.

77.     The practice of the salespeople is to discard the Yellow Sheets to conceal that the rental projections were made.  Customers are not allowed to have copies.  These fraudulent yellow sheets have been given to Prospects at each of the resort properties on a daily basis throughout the class period.  Training materials describe how to prepare the Yellow Sheets.

78.     The success of these sales tactics hinges on Defendants' ability to mislead Prospects to believe that there is a high rental demand for the units.  According to scripts of sales presentations, Prospects are advised of the "average net rental return" ("Rental Return") purportedly based on information received from "various brokers."  The net return is the return after payment of maintenance fees.  The Prospects are provided with a list of Brokers, including Defendant RIM, with whom the unit can be listed.  On some occasions, Brokers are "called" from the sales table to confirm the rental return information, or letters from the Brokers are presented stating that the Brokers are in need of inventory and are renting at the rates promised by the salesperson.

79.     Training materials and consequently sales presentations further state that the average net rental return, from information received from brokers, is:

**Mayan Palace Inventory**

RED WEEKS $1,400 FOR A Two-bedroom/ $1,000 for a One-bedroom/ $700 for a Studio.

ELITE WEEKS $2,000 for a Two-bedroom/ $1,500 for a One-bedroom/ $1,000 for a Studio.

**Grand Mayan Inventory**

RED WEEKS $2,000 FOR A Two-bedroom/ $1,500 for a One-bedroom/ $1000 for a Studio.

ELITE WEEKS $2,500 for a Two-bedroom/

$2,000 for a One-bedroom/ $1,500 for a Studio.

Salespeople write these figures down on Yellow Sheets for Prospects.

80.     Mayan Resorts salespeople thus misrepresent to Prospects that, based on the rental returns, they will earn money on the investment.  For example, for the "4+4" package – that is, four weeks of vacation plus four weeks rented out – for a 1-bedroom unit, salespeople misrepresent to the Prospects that if they spend $149,900 today and use the four free weeks for rental every year, they will net $5,600 every year.  For a 2-bedroom suite in the Grand Mayan, salespeople misrepresent to Prospects that they can net $10,000 per year in rent, after maintenance fees, by renting out 4 weeks of a 4+4.

81.     Prospects are told that any good real estate agent will advise the Prospect to hold onto the property for a minimum of 3 to 5 years, to build up equity.  The salespeople say that if the Prospect does the exact same thing here and rents for the next 5 years, the Prospect will net $28,000, "in your pocket," bringing today's $149,900 investment to only $121,900.

82.     According to a Training Package, the various offers are titled "Investment Package" or "Vacation Investment Package." Salespeople misrepresent to Prospects on a daily basis that the 4+4 package is called the "Vacation Investment Package" because most people rent the unit for all of the weeks.

83.     Salespeople misrepresent to Prospects that they can sell on a "1+1" basis, with the second week "free," because members often rent out the properties during the "free" week, bringing in new customers, 40% of whom will buy units themselves.

84.     Salespeople regularly misrepresent to Prospects that it is in their best interests to purchase as many units as they can afford because of the investment value of the units.

19

85.     The incentives for the Brokers to participate in this fraud are the upfront fees that the Brokers receive for each listing and, in the case of RCI, the share of sales revenue received from Mayan Resorts in exchange for their complicity and customer referrals.

86.     In fact, the timeshares at these resorts are not good investments.  As Mayan Resorts, the Brokers and all Defendants are aware, the units are difficult to rent, and if they are rented, the rental return often does not even cover the high maintenance fee that the purchaser must pay each year in addition to the cost of purchase.

87.     Mayan Resorts charges high annual maintenance fees for each week purchased.  In 2006, those maintenance fees were:

| Mayan Palace | Maintenance Fee: |
|---|---|
| Two-bedroom | $630 |
| One-bedroom | $510 |
| Studio | $370 |
| **Grand Mayan** | **Maintenance Fee:** |
| Two-bedroom | $785 |
| One-bedroom | $605 |
| Studio | $475 |

88.     The units, if they can be rented at all, rarely rent for more than these maintenance fees.  This is confirmable as many units are available at these low rates on, for example, eBay and redweek.com.

89.     In fact, units can be purchased and rented on eBay or redweek.com for a tiny fraction of the original purchase prices and promised rental rates. Between December 24, 2007 and January 6, 2008, for example, no units sold on eBay, but a Grand Mayan 1-bedroom "2+2" (four weeks total) unit was listed for sale.  The

20

owner posted that "[i]t sold new in 2005 for [$]59,900," but the highest bid for the unit was $1,025.  Moreover, 34 units were listed for rent on eBay during that same period, but only two were rented.  One was a 2 bedroom Grand Mayan Grand Master Suite that rented for $350 for the week of April 6-13, 2008.  (The other was an annual charity auction; the high bid was $3,525.)  Typical unsuccessful listings included a 2-bedroom Grand Mayan unit for $1,299 and a 2-bedroom Mayan Palace unit for $799.  Most units are re-listed week after week by the same brokers.

90.    Similarly, at redweek.com, dozens of unrented, unsold units are offered at steep discounts from the original sale prices and promised rental rates.  On January 9, 2008, a 2-bedroom Grand Mayan unit could be rented for $850/week or purchased for $8,997, and a 2-bedroom Mayan Palace unit could be rented for $490/week or purchased for $3,000.

91.    As instructed by training materials, salespeople also tell Prospects that the Mayan Palace prices increase a minimum of 15% per year.  However, in reality, and as known to Defendants, the resale market for the units exists only at substantial discounts.

**B.    False Statements about the Right to Cancel**

92.    Under Article 56 of Mexico's federal consumer protection law, a purchaser may cancel a timeshare purchase contract within five working days of signing the contract.  This right cannot be waived.  The Training Package, however, instructs salespeople on how to convince Prospects that they have waived the right to cancel, or at least that, by canceling, the Prospect has forfeited the substantial deposit paid on the contract.  Indeed, the Training Package states "We need to work together . . . to get them past the five days. . . ."

93.    Furthermore, the form contract all purchasers sign contains material misrepresentations about the right to cancel.  That form contract states that "You have the right to cancel this agreement within five days after the date you sign by

(A) returning all documentation to the member service representative at the resort with all signees being present, and (B) sending written notification by certified mail . . . ."  In fact, Article 56 states that cancellation may be accomplished in person, by registered mail, or by other reliable means, and that a purchaser has five business days to cancel, not just five days.  Contrary to the salespeople's misrepresentations, purchasers do not waive the right to cancel, nor forfeit any deposit, merely by failing to "return[] all documentation to the member service representative at the resort with all signees being present."

94.    All purchasers also sign a "New Member's Verification Statement" which states: "[I]f I cancel an active agreement for any reason, I will not receive a refund of any monies paid."

95.    By misleading buyers into believing the right to cancel has been waived, Defendants avoid rescission claims, or, at a minimum, retain buyers' deposits.

96.    Deposits alone are profitable for Mayan Resorts.  The typical deposit is 35% of the sales price (by wire or credit card) and the minimum deposit is 25%.

97.    Training materials instruct that salespeople are to use discounts, "credits," "equity trade-ins" and upgrades to lure the Prospect into believing that they have waived their cancellation right.

98.    The use of discounts, credits and upgrades is made possible by inflating the actual sales price of the timeshare unit.  The first price that the prospect is quoted is between 150% and 200% of the price at which the salesperson is authorized to sell the unit.  For example, for a Suite, the prospect may be told the sales price is $49,900, when in fact the authorized price is $29,900.  The padding in the price is used to give "rental credit," "equity trade-in credit," upgrades, or discounts off the contract price.  Training materials advise that for the same unit, "if the clients' income is over $100,000 then you open with $199,900.  If the Clients' income is under $100,000 then you open with $109,900."

99.    For "rental credit," Mayan Resorts will agree to "rent" the unit for the prospect at the Rental Return rate, and credit that amount to the purchase price. The Training Materials instruct salespeople to tell Prospects who are offered the "rental credit" that in order to receive rental credit off the contract price, the membership must be activated that day.  Prospects are told that they have the right to cancel within five days but because this is an active contract, if the Prospect cancels, the Prospect will lose the deposit.

100.    The offer of the rental credit in fact serves three purposes.  First, the salesperson tells the Prospect the rents that will be earned in the first year, and then appears to back up that assertion by taking a credit for the first year of rent against the total sales price.  In truth, Mayan Resorts offers the rental credit against an offer at least 60% above its bottom line and does not actually rent out properties for which it gives a rental credit.

101.    Second, granting the rental credit conceals from purchasers for one year that there is no rental market for the Mayan Resort units.  Concealing the truth for one year benefits Defendants because it causes the purchaser to forego rights at the Consumer Protection Agency of Mexico, which has a one year limitations period.

102.    Third, the salesperson tells the Prospect that, to earn the credit, the Prospect will have to waive his or her non-waivable 5-day right to rescission.

103.    "Trade-in credit" applies where a Prospect currently owns a timeshare at another property.  Approximately 30 to 40 percent of all Prospects already own a timeshare.  The training materials instruct the salesperson to tell the Prospect that their current timeshare may have trade-in value.  To confirm this, the salesperson goes to a telephone (which in some cases is not actually operating) and purports to speak with a timeshare broker to determine the fair market value, or goes to another room and returns with a document purporting to provide an appraisal of the Prospect's timeshare.  Many timeshares are less expensive than Mayan Resorts so

23

that the salesperson can offer a trade in reduction in the purchase price that is attractive: for example, a $20,000 credit for a timeshare purchased for $15,000.  For Mayan Resorts, this again is simply a credit off a very high list price.

104.   Mayan Resorts sells trade-ins as bulk sales to a service for pennies on the dollar, while creating the illusion that the buyer is selling his or her timeshare at an appreciated price.  As with rental credits, in accordance with the training materials, salespeople tell Prospects that, in order to receive equity credit off the contract price, the membership must be activated today.  Salespeople again tell Prospects that they have the right to cancel within five days but because "this is an active contract," upon cancellation, the deposit will be forfeited.

105.   Salespeople also sell upgrades in units at Mayan Resorts to assist in the fraud.  As with the other incentives, salespeople are instructed to represent and do falsely represent to Prospects that they have the right to cancel for five days, but that because they have purchased an upgrade, "this is an active contract," so that "if you cancel, you will lose your deposit."

106.   In the second half of April 2005, Mayan Resorts temporarily permitted cancellations within five days without a loss of deposit.  Cancellation rates rose from 2% in the first half of the month to 21% in the second half of the month.

107.   During various periods of the fraudulent scheme, Mayan Resorts has resorted to serving alcohol to Prospects during breakfast or upon a sale to assist in completing the fraudulent sales.

108.   In the event of an attempted cancellation within the five day period, Defendants use a variety of different misrepresentations to resist cancellation, claiming that the cancellation fax was not received, that the office was closed when the cancellation was sent, that no waiver is allowed, that the representative receiving the cancellation notice lacks authority to accept the cancellation, or that the buyer's salesperson must be present for the cancellation but is unavailable.

1    109.   For all these reasons, the purchase contract is procured by fraud,

2    including those provisions that contradict the representations that are made about

3    rental and investment.

4

5                         **CLASS ACTION ALLEGATIONS**

6    110.   The Class that Plaintiffs seek to represent is defined as:

7           All persons who purchased a Mayan Resorts timeshare within the

8           preceding four (4) years and executed a document waiving their right

9           to have their deposit returned if the contract was cancelled within five

10          (5) business days.

11

12   111.   Plaintiffs seek to represent a subclass of:

13          All Californian residents who purchased a Mayan Resorts timeshare

14          within the preceding four (4) years and executed a document waiving

15          their right to have their deposit returned if the contract was cancelled

16          within five (5) business days.

17   112.   This action is properly maintained as a class action in that:

18          a.  Without class certification, prosecution of separate actions by

19              individual members of the Plaintiff Class would be prohibitively

20              expensive for individuals and consumers and will create the risk of

21              inconsistent or varying adjudications with respect to individual

22              members of the Class, which would establish incompatible

23              standards of conduct for the parties opposing the Class; or,

24              adjudication with respect to individual members of the Class would

25              as a practical matter be dispositive of the interests of the other

26              members not parties to the adjudication or substantially impair or

27              impede their ability to protect their interest.

28          b.  The representative Plaintiffs will fairly and adequately represent

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

and protect the interests of the Class Members, and have retained
counsel who are competent and experienced in class action
litigation.  There are no material conflicts between the claims of the
representative Plaintiffs and the members of the Class that would
make class certification inappropriate.  Counsel for the Class will
vigorously assert the claims of all Class Members.

c.  The claims of the representative Plaintiffs are typical of the claims
of each of the Class Members.  Plaintiffs, like all other members of
the Class, have sustained damages arising from Defendants'
violations of the laws of the State of California and of the United
States.  Plaintiffs and the members of the Class were and are
similarly or identically harmed by the same unlawful, deceptive,
unfair, systematic and pervasive pattern of misconduct engaged in
by the Defendants.

d.  Common questions of law and fact exist as to the members of the
Class and predominate over any questions affecting only individual
members, and a class action is superior to other available methods
for the fair and efficient adjudication of the controversy, including
consideration of:

(1)  The interests of the members of the Class in individually
controlling the prosecution or defense of separate actions;

(2)  The extent and nature of any litigation concerning the
controversy already commenced by or against members of
the Class;

(3)  The desirability or undesirability of concentrating the
litigation of the claims in the particular forum; and

(4)  The difficulties likely to be encountered in the management
of a class action.

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

113. Among the many questions of law and fact common to the Class are:

   a. Whether the Mayan Resorts Defendants falsely represented the nature of the cancellation waiver;

   b. Whether Defendants falsely represented, failed to disclose and concealed the investment value of the timeshare units;

   c. Whether Defendants conspired with others to falsely represent the Rental Return of the timeshare rentals;

   d. Whether Defendants' acts constitute violations of the federal RICO statute, 18 U.S.C. § 1961 et seq.;

   e. Whether Defendants' activities related to their failure to disclose that the five (5) day right to cancellation could not be waived constitute violations of California's Unfair Competition Law, Business and Professions Code § 17200, et seq.;

   f. Whether the fact that the five (5) business day right to cancel was non-waivable was material and relevant information under California's Unfair Competition Law, Business and Professions Code § 17200, et seq.;

   g. Whether Defendants' conduct is "unlawful," "unfair" or "fraudulent" within the meaning supplied by California's Unfair Competition Law, Business and Professions Code § 17200, et seq.;

   h. Whether Defendants' acts constitute "unfair competition" within the meaning of California's Unfair Competition Law, Business and Professions Code § 17200, et seq.;

   i. Whether Defendants' acts constitute false advertising within the meaning of California Business and Professions Code § 17500, et seq.;

   j. Whether Defendants' acts constitute common law fraud;

   k. Whether Defendants' acts constitute fraud in the inducement;

27

l.   Whether Defendants' acts constitute civil conspiracy to defraud;

m.  Whether Defendants' acts constitute breach of the duty of good faith and fair dealing;

n.   Whether Defendants' acts constitute negligence;

o.   Whether Defendants' acts constitute gross negligence;

p.   Whether Defendants' acts constitute negligent misrepresentation; and

q.   Whether Defendants' acts constitute grossly negligent misrepresentation.

114.   As to the issues raised in this case, a class action is superior to other methods for the fair and efficient adjudication of this controversy, because joinder of all Class Members is impracticable and because many legal and factual questions to be adjudicated apply uniformly to all Class Members.  Further, as the economic or other loss suffered by vast numbers of Class Members may be limited compared to the costs of litigation, the expense and burden of individual actions makes it difficult for the Class Members to individually redress the wrongs they have suffered.

115.   The class action is superior to other available methods for a fair and efficient adjudication of the claims presented by this Complaint and would reduce the financial, administrative and procedural burdens on the parties and on the Court which individual litigation otherwise would impose.

## COUNT I:

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")

### (18 U.S.C. § 1961 et seq.)

116.   Plaintiffs repeat and reallege the allegations in every previous paragraph of this Complaint as if fully set forth herein.

117.   From at least four year prior to the filing of this Complaint and continuing to the present, Defendants and their coconspirators repeatedly engaged in mail and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343, thereby continually engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B), in the course of executing the described fraudulent scheme.

**A.     Specific Acts of Fraud**

118.   Plaintiffs incorporate by reference the specific acts of fraud and misrepresentation identified above.  In addition, Plaintiffs state the following specifics with respect to the named Plaintiffs.

**1.     Jessica Monugian and Michael Gonzales**

119.   On October 21, 2006, Jessica Monugian and Michael Gonzales arrived in Mexico for a nine-day vacation at another resort near Cancun.  When they missed their shuttle from the airport, they were approached by a Mayan Resorts representative who offered them a shuttle ride to their hotel and deals on tourist packages if they would attend a 90-minute timeshare presentation at Mayan Resorts.

120.   On October 22, 2006, Monugian and Gonzales returned to Mayan Resorts and checked in at the sales table.  Carlos Martinez introduced himself as their salesperson and then took them to a complimentary brunch.  After brunch, he led them on a tour of models of the various Mayan Resorts properties, and told them about how to rent it out.  He said if they bought the two bedroom unit, there was a partition, so one could rent one side and stay in the other.  He said the two bedroom was a better deal as a result.

121.   After the tour, Martinez led them to a large open room with lots of tables.  He showed them brochures showing the various units.

122.   Martinez then offered them a 2 week, 2 bedroom unit.  Monugian and Gonzalez declined.  Martinez then lowered the price to $100,000.  They declined again.  Martinez then asked what they could afford.  When they answered

1  noncommittally, he brought over an older gentleman whom Martinez called his
2  "boss."

3      123.   Martinez's boss said that Monugian and Gonzales could buy a
4  "customer return" unit for $30,000, explaining that the previous customer had
5  upgraded and that the unit was valued at $65,000.  When they declined again, the
6  boss asked them to write down how much they spend on vacation for a year.

7      124.   Then Martinez's boss said he had another "customer return" deal.  He
8  said that because it was a special price – a $27,000 unit lowered to $19,120 –
9  Monugian and Gonzales would have to waive their 5-day right to cancel.

10      125.   Martinez represented to Monugian and Gonzales that they could rent
11  their unit for $2,500 per week.

12      126.   Monugian and Gonzales signed a purchase contract that contained
13  false statements.  The contract falsely stated that "You have the right to cancel this
14  agreement within five days after the date you sign by (A) returning all
15  documentation to the member service representative at the resort with all signees
16  being present, and (B) sending written notification by certified mail . . . ."

17      127.   Monugian and Gonzales also signed a "New Member's Verification
18  Statement" falsely stating that "if I cancel an active agreement for any reason, I will
19  not receive a refund of any monies paid."

20      128.   After Monugian and Gonzales had signed their purchase agreement,
21  Martinez's boss assured them they had made a good investment.

22      129.   Two days later, Monugian and Gonzales called Martinez and left a
23  voicemail saying that they did not want to purchase the timeshare.  Martinez called
24  back the next day and said he was busy, but would like to meet for dinner.  But later
25  that day, Martinez left a note at their hotel saying that he could not have dinner with
26  them.

27      130.   When they returned home to California, Monugian and Gonzales
28  called Mayan Resorts multiple times, including on January 31, 2007, attempting to

cancel.  On March 5 a representative called them back, at which time they cancelled their purchase, but were told that in doing so they forfeited their deposit of $4,780.  On March 25, 2007, someone purportedly from Mayan Resorts called to confirm that the cancellation had been effected, but that their deposit would not be returned.

131.   On February 28, 2007, Monugian called RCI from her home in California.  She spoke with someone named Caleb.  She gave him their member number and requested cancellation.  After putting Monugian on hold for fifteen minutes, Caleb told her that he had processed her request and that she could expect a refund in the mail.  Neither Monugian nor Gonzales ever received any refund from RCI.

**2. Kathleen Janiec**

132.   While checking into the Mayan Palace in Puerto Vallarta for her vacation on June 25, 2006, Kathleen Janiec was asked if she would be interested in attending a 90-minute "resort" talk with a complimentary breakfast.  For her time, she would also receive a 15% discount on all room charges.

133.   The next day Janiec arrived for the presentation.  She was introduced to her salesperson, who took her on a tour of models of various Mayan Resorts properties and then to a free breakfast.  After breakfast, she was escorted by her salesperson to a large open room with lots of tables.

134.   The salesperson showed her various Mayan Resorts properties, compared hotel prices to timeshare ownership, explained the low cost of timeshare ownership, and touted the investment value of the unit, all the while writing calculations on yellow sheets of paper.

135.   Finally, he offered to sell her a timeshare for $22,500.  Janiec laughed and said she couldn't afford it.  The salesperson cut the price of the unit several times, but Janiec declined each time.  When she rose to leave, the salesperson told her that he needed to get one of his managers to sign her out.

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

136.   The manager, Kyle Daudrich, asked Janiec how they could make a purchase affordable.  She replied that they would have to lower the price to $5,000 for her to be able to afford it.  Daudrich then offered to purchase the timeshare Janiec owned at another resort, Pueblo Bonito.  The original salesperson went to another room and returned with a document purporting to appraise the value of Janiec's Pueblo Bonito unit at $8,600.  The salesperson wrote "$10,000," explaining that she should be able to sell the unit for that price.

137.   He explained that selling her Pueblo Bonito unit to Mayan Resorts for $8,600 would cut the price of the Mayan Resorts timeshare to $13,900.  He then told her that, after the sale of her Pueblo Bonito timeshare, he would void that sale, giving her back the rights to the Pueblo Bonito timeshare.  He further explained that because she could then sell the Pueblo Bonito for at least $8,000 or $9,000, the total cost to her for the Mayan Resorts unit would be between $5,000 and $6,000.  He assured her that selling her timeshare would be easy because it was in a good resort and had already increased in value by $2,000 since she had bought it one year earlier.

138.   Daudrich also explained to Janiec that she could rent out her timeshare for $1,500/week through RIM, paying for almost three years of maintenance fees by renting her unit for one week.  He circled and starred RIM and the name Phaedra Almstead on a list of resale and rental brokers.  When Janiec questioned the success rate of weekly rentals, Daudrich assured her that the rental rate was very high, somewhere around 80%.  He said that he used Almstead all the time to rent his properties, and always successfully rented his weeks.

139.   Janiec asked to think about it overnight, but the salespeople told her no and said they could not give her the same offer the next day.

140.   Janiec was never told anything about her right to cancel.

141.   Janiec signed a purchase contract that contained false statements.  The contract falsely stated that "You have the right to cancel this agreement within five

32

days after the date you sign by (A) returning all documentation to the member service representative at the resort with all signees being present, and (B) sending written notification by certified mail . . . ."

142.   Janiec also signed a "New Member's Verification Statement" falsely stating that "if I cancel an active agreement for any reason, I will not receive a refund of any monies paid."

143.   *After* Janiec signed her purchase agreement, Daudrich brought over a woman who asked Janiec a series of questions about what she had and had not been promised.  When asked about rental guarantees, she repeated what had been told to her.

144.   The day after she returned to her home in California, Janiec called her credit card company to put a hold on her deposit payment so that she could investigate her purchase before following through.  The bank told her that it had already made the charge and could not reverse it.

145.   On or about August 6, 2006, Janiec followed her salesperson's advice and paid $299 to RIM, by credit card from her home in California, for the purpose of renting out her unit.  RIM did not disclose to her that there was no prospect of rentals for her timeshare and that no potential consumer would pay the $299 fee that RIM requested.  Neither RIM nor she has ever rented out the property.

**3.  Gerald and Feng Yan Wolke**

146.   From their home in California, the Wolkes booked a vacation at Mayan Resorts' Grand Mayan Riviera Maya for June 2006.  While at the Grand Mayan Riviera Maya on June 18, 2006, the Wolkes were invited to attend what they were told would be a 90-minute presentation.  For their time, they were promised free breakfast and $100.  They agreed to attend.

147.   The Wolkes and their daughter Kira, then 10 years old, arrived to attend the sales presentation on the morning of June 20, 2006.  They checked in at a long desk and were assigned a salesperson who identified himself as Jack

1   Poursanidis.  Poursanidis took them to a large room with lots of square folding

2   tables, seated them at one of the tables, and spent a few minutes telling them about

3   himself and asking them about themselves and about their vacation.

4       148.   After breakfast, Poursanidis led the Wolkes on a tour of the resort and

5   then returned them to the sales room.  There, the Wolkes told him that they were

6   not interested in buying a timeshare because they had recently bought a Hilton

7   timeshare elsewhere.  In response, Poursanidis recruited to the table someone

8   identified as Monique, who was represented to be a manager.  Monique gave Kira

9   money and sent her off to buy ice cream, offered Amber an alcoholic drink, and

10   then began to pitch various deals.  The Wolkes repeatedly declined.

11       149.   Finally, Monique pitched an "investment."  She told the Wolkes that

12   the Mayan Resorts timeshare would earn $3,285 per week, minus approximately

13   $800 in maintenance fees, so that the Wolkes would net at least $2,485 per week

14   without having to do anything.  Gerald Wolke asked Monique, "is that

15   guaranteed?"  Monique responded, "yes, it's guaranteed."  She told the Wolkes

16   recently someone had bought 60 units to rent them out and make a lot of money.

17       150.   To sweeten the deal, Monique said that they could do an "equity

18   exchange": Mayan Resorts would buy their Hilton timeshare for $1, and then deed

19   it back to the Wolkes and use it as a "write-off."  She also cut the original pitched

20   price in half, and promised to provide a letter guaranteeing the same price if the

21   Wolkes decided to buy additional weeks.

22       151.   Neither Monique, Jack Poursanidis, nor any other salesperson

23   mentioned Mexico's mandatory 5-day rescission, or "cooling off," period during

24   the presentation and sale.

25       152.   During the presentation, the Wolkes were not told that the market price

26   for their investment was a fraction of the purchase price and that no rational

27   investor would have made such a purchase.  The Wolkes also were not told that

28   they had a non-waivable right to cancel the transaction within five business days.

153.   In reality, the Wolkes' investment is worth nothing today because rental prices do not exceed the annual maintenance fees.

154.   During the presentation, Poursanidis recommended that the Wolkes contact RIM to resell or rent their new timeshare unit for them.  He circled their name and contact information on a sheet listing RIM and other rental and resale companies, which he then gave to the Wolkes to take home.  He told them that his mother had used them.

155.   The Wolkes signed a purchase contract that contained false statements. The contract falsely stated that "You have the right to cancel this agreement within five days after the date you sign by (A) returning all documentation to the member service representative at the resort with all signees being present, and (B) sending written notification by certified mail . . . ."

156.   The Wolkes also signed a "New Member's Verification Statement" falsely stating that "if I cancel an active agreement for any reason, I will not receive a refund of any monies paid."

157.   The Wolkes paid a deposit of $11,374 using a credit card.

158.   The day after they made their purchase, the Wolkes immediately felt they had made a mistake, so Gerald Wolke called the sales office.  Jack was unavailable.  Wolke spoke with Monique.  He said that he was going to look on the Internet to see whether there was any evidence of fraud that would make him want to cancel.  Monique falsely told him that there was no point in doing that because they had exchanged equity, and if they cancelled they would forfeit their entire deposit.

159.   When they returned home to California, the Wolkes called RIM to rent their Mayan Resorts timeshare unit.  RIM represented that they would list the Wolkes' unit for $3,500 per week.  Approximately three weeks later, they paid RIM $299 from their home in California using a credit card.

160.   RIM did not disclose to the Wolkes that there was no prospect of rentals for their timeshare and that no potential consumer would pay the $299 fee that RIM requested.

161.   After signing up and paying the $299 fee, the Wolkes heard nothing from RIM.  From his home in California, Gerald emailed RIM to inquire about their listing, but never heard back from RIM.

162.   On or about July 20, 2006, from their home in California, the Wolkes paid the $21,122 balance due to Mayan Resorts by credit card.

163.   On October 11, 2006, the Wolkes sent a letter to Mayan Resorts from their home in California, in another attempt to rescind.  Eventually, Mayan Resorts responded with various inadequate offers.  First they offered to waive the Wolkes' maintenance fee for five years.  Later they offered to return $11,000 and transfer the Wolkes' interest to lower-cost unit.  The Wolkes declined those offers and tried to follow up again, but never heard from Mayan Resorts again.

164.   The Wolkes also disputed the purchase charges on their Citibank MasterCard, but after a short investigation, Citibank declined to remove the charges from their bill.

165.   RIM never generated any rentals for the Wolkes.  Although RIM initially listed their unit for $3,500 per week, other websites list similar properties for as little as $350 per week.

166.   The Wolkes contacted Discover and disputed the $299 RIM charge.  Discover removed the charge from their account.

**4.  James and Anna Almond**

167.   While vacationing in Puerto Vallarta on or about February 9, 2005, the Almonds asked for directions at a booth on the street and the booth attendant struck up a conversation with them.  The attendant invited them to attend a 90-minute presentation about Mayan Resorts at the Mayan Palace in Puerto Vallarta, and as

1 inducement offered them various incentives, including a free breakfast and a free

2 tour aboard the *Marigalante*, a local harbor cruise ship.

3    168.   On February 12, 2005, the Almonds were picked up at their hotel and

4 transported free of charge to the Mayan Palace facility.  Upon their arrival, they

5 were required to present picture ID and a credit card.  A representative then greeted

6 them, gave them a brief summary of the morning's agenda, and took them to

7 breakfast.  After breakfast, they were escorted on a tour of the premises and shown

8 a model one-bedroom unit.  The representative then escorted them to the sales area,

9 a large open room with lots of tables.

10    169.   The Almonds' representative, a young woman, explained that the

11 timeshare provides less expensive vacation lodging than hotel prices.  She tried to

12 get the Almonds to purchase a four-week ("4+4") timeshare. When they declined,

13 she offered a two-week ("2+2") timeshare, and then finally a one week ("1+1")

14 timeshare.  The Almonds were told that the deals offered were the lowest ever

15 offered by Mayan Resorts and that the prices would rise later in the year.

16    170.   When the Almonds remained unconvinced, the salesperson brought

17 over a second representative who aggressively attempted to get the Almonds to buy

18 a timeshare unit, offering better deals and utilizing a more "hard sell" style.  James

19 Almond mentioned to her that he was concerned not only about the cost of the unit,

20 but about his loss of interest-bearing capital if he were to spend that capital on

21 purchasing a unit.  She explained that if he were to rent out one or both of his

22 weeks, he would make money.  She said that if they were to spend one week in

23 Mexico each year and rent out the unit for the other week, the unit would easily be

24 rented for $1,400 per week, which would exceed their yearly maintenance fee.

25 When Jim asked to verify that they could hope to get $1,400 per week for the unit,

26 the salesperson insisted that it was not just hope, but that they would definitely get

27 $1,400 per week.

28

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

171.   James then said he wanted to visit the restroom and talk to his wife alone briefly, but when they left the sales room, the first salesperson would not leave them alone, but stayed with them and even waited for him just outside the restroom.

172.   Upon their return, the Almonds indicated they were interested in purchasing a one-bedroom unit.  The second representative told them they could cancel their contract within five days, but that if they did so, they would lose their deposit.

173.   The Almonds signed the paperwork and paid a $4,900 deposit on James' Visa card.  He paid the balance of $10,560 on the same card approximately 30 days later.

174.   Using their new timeshare weeks, the Almonds booked a two week vacation at the Mayan Palace Riviera Maya, near Cancun, for November 2005. Shortly after they arrived for their vacation, they attended a free breakfast that they were told was for members – that is, timeshare owners – to hear updates about the properties. In fact, they were invited to another sales presentation.

175.   The assigned salesperson, a young man, offered to upgrade them from a two-bedroom Mayan Palace unit to a more luxurious two-bedroom Grand Mayan unit.  The Almonds were confused because they thought they had purchased a one-bedroom unit, but the salesperson insisted Mayan Resorts' records indicated they had purchased a two-bedroom unit.

176.   He gave them a tour of model Grand Mayan units, but the Almonds told them they were happy with their Mayan Palace unit and declined to upgrade.

177.   As before, the salesperson then brought over a second, "hard sell" representative who aggressively tried to get the Almonds to upgrade their Mayan Palace unit to a Grand Mayan unit.  This representative then began talking about rental values.  On yellow sheets of paper, she wrote figures purported to demonstrate that a $15,000 upgrade would not, in fact, cost them very much.  When

Jim Almond took one of the yellow sheets to look over, one of the salespeople took it back.

178.   The second salesperson offered to "carry over" the Almonds' 2006 weeks, giving them two extra weeks, and she also offered to give them an additional extra week.  She explained that they could rent out their five weeks for $2,500 per week, and, after maintenance fees, net approximately $1,800 per week for each of the four weeks, which would pay for most of the capital cost of the upgrade.

179.   The second salesperson also gave the Almonds a list of resale and rental agents.  She recommended they use RIM, writing a check-mark next to RIM on the list.  She said that RIM charged a $299 lifetime advertising fee.  She told them to start at the very beginning of the year so that they would be "first in line" to rent.

180.   Jim Almond then asked, "then we hope to get $2,500 per week for them, right?"  The salesperson replied that there was no hoping; $2,500 per week was "what you **will** get."

181.   The salesperson then gave Jim a letter purportedly from RIM, stating that "due to high demand," RIM was "in need of Cancun Mexico inventory . . . ."  The letter quoted average gross rental rates between $2,000 and $2,800 per week for a 2-bedroom Grand Mayan unit.  A second letter from Destinations International quoted the same rates.

182.   Confident that they could rent the unit for five weeks in 2006, the Almonds upgraded to a 2-bedroom Grand Mayan "red week" ("1+1") unit for $15,400.  They paid a deposit of $5,495 using their visa credit card from their home in California.  They paid the balance of $10,205 in two subsequent installments, also on their Visa credit card from their home in California.

183.   The Almonds signed a purchase contract that contained false statements.  The contract falsely stated that "You have the right to cancel this

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

agreement within five days after the date you sign by (A) returning all documentation to the member service representative at the resort with all signees being present, and (B) sending written notification by certified mail . . . ."

184.   The Almonds also signed a "New Member's Verification Statement" falsely stating that "if I cancel an active agreement for any reason, I will not receive a refund of any monies paid."

185.   During the presentation, the Almonds were not told that the market price for their investment was a fraction of the purchase price and that no rational investor would have made such a purchase.  The Almonds also were not told that they had a non-waivable right to cancel the transaction within five business days.

186.   On January 2, 2007, as instructed, the Almonds signed up with RIM and paid the $299 fee.  For four months, they heard nothing from RIM.  They called RIM and were told that they were on a priority list and that RIM was optimistic that their weeks would be rented.  Over the summer, the Almonds called again; this time the representative was not as reassuring.  After that, the Almonds called RIM many more times, but no representative would talk to them or return their calls.

187.   RIM did not disclose to the Almonds that there was no prospect of rentals for their timeshare and that no potential consumer would pay the $299 fee that RIM requested.

188.   Jim Almond advertised on eBay and in other forums to rent out their 2 bedroom Grand Mayan unit for $1,300 per week instead of $2,500.  No one ever rented the unit.

**B.    Mail and Wire Fraud**

189.   Defendants committed numerous acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 during the four years preceding the date of this Complaint, using the mail and wires with specific intent to execute their scheme to defraud.

190.   Defendants' scheme is reasonably calculated to deceive persons of ordinary prudence and comprehension in order to part such persons from their money and to induce them to surrender their legal rights.  The scheme departs from any known standard of fair play and honest dealings.  The scheme includes nondisclosure, deliberate lies and misleading communications.  Each nondisclosure, misrepresentation and misleading statement is embedded in a pattern of deception and enticements reasonably calculated to induce reliance.

191.   Defendants' fraudulent intent is established by the nondisclosures, false statements and misleading representations made by Defendants as part of a scheme intended to induce reliance and cheat U.S. consumers and investors out of hundreds of millions of dollars for their own benefit.

192.   Defendants acted with knowledge that the use of the mails or wire would follow in the ordinary course of business because such was both reasonably foreseen and even actually intended.  Mayan Resorts maintains a bank account with J.P. Morgan Chase Bank in Dallas, Texas and a post office box in Dallas, Texas that is used to receive payments and correspondence from Plaintiffs and other victims in the United States.

   a.   Defendants told Plaintiffs and other victims to make payments required by the scheme by interstate mailing of checks or wire to the Dallas bank account or post office box of Mayan Resorts.

   b.   Defendants' contracts called for payments, following a down payment, to be mailed or wired interstate to the Dallas bank account of Mayan Resorts.

   c.   The scheme depended on the transfer of monies by interstate mail or wire to the Dallas bank account of Mayan Resorts.  Defendants relied on mailing of checks and wire transfers to effectuate their scheme.

   d.   Payments are also made by credit on the telephone to the Houston call center.

41

e. Gerald and Feng Yan Wolke made two payments using their Citibank MasterCard: one for $11,374 the day of the purchase, and one for $21,122 from their home in California approximately one month thereafter.

f. James and Anna Almond made all payments using a Visa card.  When they bought their Mayan Palace unit, they paid $4,900 on the day of purchase and $10,500 approximately one month thereafter.  When they upgraded to a Grand Mayan unit, they paid $5,495 on the day of purchase, and $10,205 from their home in California in two subsequent installments.

g. Kathleen Janiec made two payments using a Visa card: one for $4,170 on the day of her purchase, and another for $9,730.  She also paid a fee of $299 to RIM on her Discover card.

h. Jessica Monugian and Michael Gonzales made one payment of $4,780 using a credit card.

**C.    Pattern of Racketeering**

193.   Defendants' repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, extended over a period of years from at least four years prior to the filing date of this Complaint to the present and involved distinct and independent criminal acts and episodes, and constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

194.   The racketeering acts are described above in this Complaint.

195.   Racketeering acts are related and amount to or pose a threat of continued criminal activity.

196.   The racketeering acts of the Enterprise (defined below) are a regular way that the Enterprise conducts the ongoing illegitimate business of Mayan Resorts.

197.   The racketeering acts are done at the direction, or the ultimate direction, of Daniel Chavez.

198.   The racketeering acts share common methods of defrauding victims who purchase Mayan Resorts timeshares as described above.

199.   The acts committed against Plaintiffs were not isolated, but are related to those committed against thousands of other U.S. victims.

200.   The acts described continue today and are an imminent and daily threat to other U.S. victims and are based on purposes that are not completed.

**D.     Enterprise**

201.   The association-in-fact of Defendants and their co-conspirators constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4).

202.   The Enterprise is separate from Defendants and their co-conspirators in that it is a group of persons and companies.

203.   The Enterprise has two primary purposes: one legitimate and the other illegitimate.  The legitimate common or shared purpose of the enterprise is the operation of the Mayan Resorts businesses as vacation destinations.

204.   The Enterprise has the common illegitimate purpose of selling Mayan Resorts timeshare units for investment, a purpose that includes the scheme to defraud U.S. citizens of their money and legal rights.

205.   The Enterprise's legitimate and illegitimate activities are related in that both are performed under common direction and control.  Further, the legitimate activity of the Enterprise and the structure of the Enterprise, among other things, provide the means for the Enterprise to conduct the pattern of racketeering activity.

206.   The Enterprise is characterized by continuity of structure and personnel.  Changes in structure have taken place where necessary to accomplish the scheme.  Personnel have continued in the scheme for substantial durations to perform roles consistent with its structure and to further the activities of the Enterprise.  Replacement of personnel has taken place for reasons unrelated to

1    continuity of the scheme and without undermining the Enterprise's functioning as a

2    continuing unit.

3        207.   The Enterprise is structured to function under the direction and control

4    of Daniel Chavez.  The Enterprise functions through a hierarchical decision-making

5    structure headed by Daniel Chavez, and does not make decisions on an ad hoc

6    basis.

7            a.   Defendant Daniel Chavez is the President and owner of Mayan

8                 Resorts.

9            b.   Defendants Mayan Resorts, Mayan Palace, Canamere, Huffsmith-

10               Kohrville, Preferred Vacations, PTS, Resort Solutions, Seven Oceans

11               and RQC are affiliates of Mayan Resorts owned or controlled by

12               Daniel Chavez.  The rights, obligations, employees, agents and assets

13               of these companies are routinely commingled and transferred between

14               each other without consideration.  In operating these companies,

15               Defendants regularly disregard the purportedly separate form of these

16               companies and treat the businesses as an integrated company under the

17               direction of Daniel Chavez.  Each of these companies is the alter ego

18               of Mayan Resorts and Daniel Chavez.

19       208.   Defendants Daniel Omar, Scott R. Erikson, and Casey Jon Owens

20   were or are employees of Mayan Resorts or its affiliates.

21       209.   Defendant AZM is a business that, in exchange for business and other

22   financial consideration, is subject to the direction and control of Daniel Chavez.

23       210.   Defendant RCI is a business that, in exchange for business and other

24   financial consideration, is subject to the direction and control of Daniel Chavez as

25   regards its participation in the frauds on the purchasers of Mayan Resorts'

26   timeshares.

27

28

**E.    Injury**

211.   Plaintiffs reasonably relied on Defendants' misrepresentations, misleading statements and omissions, and as a result (1) invested in the Mayan Resorts timeshares; (2) paid maintenance fees to Mayan Resorts; (3) invested in Mayan Resorts rather than prudent investments; (4) executed documents purporting to surrender legal rights; and (5) paid broker's fees to brokers who were falsely represented as having the ability to rent the purchased units.

212.    Gerald and Feng Yan Wolke invested $32,496 in a "1+1" "Red Week" Grand Master Suite, including a deposit of $11,374; paid maintenance fees of $785 to Mayan Resorts; executed documents purporting to surrender their legal rights on June 20, 2006; and paid $299 in broker's fees to RIM, who were falsely represented as having the ability to rent the purchased units.  (Upon disputing the charge, the Wolkes were repaid the $299 broker's fee by their credit card company.)

213.   James and Anna Almond invested $15,400 in a one bedroom Mayan Palace "red week" "1+1" unit, including a deposit of $4,900, and $15,700 more in an upgrade to a two bedroom Grand Mayan "red week" "1+1" unit, including an upgrade deposit of $5,495; paid maintenance fees of $5,698 to Mayan Resorts; executed documents purporting to surrender their legal rights on February 12, 2005 and November 15, 2005; and paid $299 in broker's fees to RIM, who were falsely represented as having the ability to rent the purchased units.

214.   The following are indicators of Plaintiffs' induced reliance on Defendants' representations that the purchase was a good investment:

  a.  The standard sales practice is to represent falsely the purchase as an investment that pays for itself.

  b.  No rational Class Member would purchase the timeshares as an investment if the true facts were disclosed.

c. No Class Member would sign documents waiving the right to cancel the transaction if they knew the right was not waivable.

d. Purchases are for 25 years or longer, and are therefore unlikely to be considered solely as a vacation spot.

e. No rational Class Member would pay the broker's fees if the true facts were disclosed.

215. Other victims also relied on Defendants' misrepresentations and misleading statements, permitting the fraudulent scheme to continue and to target Plaintiffs.

216. But for the reinvestment of the proceeds of the pattern of racketeering activity in the Enterprise and Defendants' maintenance and control over the Enterprise, Defendants would have lacked the means to engage in the continuing illegitimate racketeering activity.

217. Plaintiffs were also the intended targets of the fraudulent scheme.

1. Defendants and the Enterprise gained by reinvesting the proceeds of their pattern of racketeering activity and by maintaining and controlling the Enterprise.

**Violations of 18 U.S.C. § 1962(c)**

218. Defendants were or are employed by or associated with the Enterprise engaged in activities in interstate and foreign commerce. Defendants conducted or conduct, or participated or participate, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity previously described in this Complaint.

a. Daniel Chavez, and Mayan Resorts and Mayan Palace at his direction, operated the fraudulent scheme upon Plaintiffs and other victims.

b. Daniel Omar, Scott Erickson and Casey Jon Owens, as employees, directors and/or officers of Mayan Resorts, participated in the management and operation of the fraudulent scheme.

46

  c. Canamere/Preferred Vacations, PTS and RQC market to Prospects and operate a call center that handles reservation requests, feeding Prospects to the Mayan Resorts locations where the Prospects are lured into sales presentations and defrauded.  The call center also handles complaint calls from defrauded customers, rejecting requests for cancellation of the illegal purchase agreements.

  d. Resort Solutions, Seven Oceans, AZM, RCI and RIM market timeshare rentals to Prospects and then feed those Prospects to the Mayan Resorts locations to be lured into sales presentations and defrauded as described above and then collect rental fees.

  e. RCI fraudulently shares revenues from timeshare purchasers as described above.

219. Each Defendant is associated with the Enterprise as described above.

**Violations of 18 U.S.C. § 1962(d)**

220. Defendants have conspired to violate Section 1962(c).

221. Each of Defendants was a knowing and willing participant and conspirator in the unlawful activity undertaken by the Enterprise.

222. In furtherance of their conspiracy to defraud Plaintiffs and other victims, Defendants committed the predicate acts described above, in violation of 18 U.S.C. § 1962(c).

223. As a direct result of the Defendants' conspiracy to harm Plaintiffs and other victims, Defendants proximately caused Plaintiffs the injuries described above.

224. Defendants are jointly and severally liable for causing Plaintiffs' injuries.

//

//

47

**COUNT II:**

**FALSE ADVERTISING**

**(Cal. Bus. & Prof. Code § 17500, et seq.)**

225.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

226.   Plaintiffs bring this claim for relief on behalf of themselves and the members of the Class.

227.   Defendants' business acts, false statements and materially misleading omissions alleged herein constitute unfair trade practices and false advertising, in violation of the Cal. Bus. & Prof. Code § 17500, et seq.

228.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions that were likely to deceive the public and include, but are not limited to:

      a.   Defendants' practice of misrepresenting that the timeshare units were good financial investments;

      b.   Defendants' failure to disclose to consumers and members of the Class that the timeshares have a market value far below the purchase price;

      c.   Defendants' failure to disclose to consumers and members of the Class that the five (5) business day cancellation period was not waivable;

      d.   Defendants' practice of using "credits," "equity trade-ins" and "rental credits," as discussed above to represent falsely that the five (5) business day cancellation period could be, and was, waived; and

      e.   Defendants' practice of misrepresenting the rental demand for the timeshare units in their advertisements and or their website.

229.   Defendants' marketing constitutes misleading, unfair and fraudulent advertising which was intended to, and did induce consumers to purchase Mayan

48

1    Resorts' timeshare units.  Defendants knew, or with the exercise of reasonable case
2    should have known, that their marketing was misleading, unfair, false and untrue.

3        230.    Plaintiffs and the other Class Members suffered monetary injury as a
4    direct result of Defendants' wrongful conduct.

5        231.    As a result of Defendants' unlawful, unfair, fraudulent and/or
6    deceptive acts and/or omissions, the unlawful profits therefrom will not be
7    completely and fully restored to the rightful owners without equitable order of
8    disgorgement and restitution, as properly determined pursuant to statute, including
9    Cal. Bus. & Prof. Code § 17535, and other applicable law.

10        232.    Pursuant, in part, to Cal. Bus. & Prof. Code § 17535, Plaintiffs and the
11    other Class Members seek a judicial order directing Defendants to desist with all
12    false advertising related to the sale of Mayan Resorts timeshare units.

13        233.    Pursuant, in part, to Cal. Bus. & Prof. Code § 17535, Plaintiffs and the
14    other Class Members seek a judicial order directing Defendants to restore, to
15    persons in interest, all unlawfully, unfairly, fraudulently and/or deceptively
16    obtained payments for Mayan Resorts timeshare units, and maintenance fees paid
17    therein, plus interest due thereon at legal rate, and disgorgement of all other ill-
18    gotten gains.

19        234.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs and the other
20    Class Members seek an order for an accounting of profits by Defendants related to
21    the sale of Mayan Resorts timeshare units, and an order requiring disgorgement of
22    these ill-gotten gains from Defendants.

23        235.    As a result of Defendants' unlawful, unfair and fraudulent acts and/or
24    omissions, as well as their refusal to acknowledge that such acts and omissions are
25    improper, such conduct will not to be completely and finally curtailed without
26    orders of injunctive nature, as properly determined pursuant to statute and law.

27        236.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs and the other
28    Class Members seek judicial orders of an equitable nature against all Defendants,

1   including, but not limited to, orders declaring such practices as are complained of

2   herein to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from

3   undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or

4   omissions related to selling of Mayan Resorts timeshare units.

5

6                          **COUNT III:**

7                **UNFAIR BUSINESS PRACTICES**

8             **(Cal. Bus. & Prof. Code § 17200, et seq.)**

9          237.   Plaintiffs incorporate and adopt by reference the allegations contained

10  in each and every preceding paragraph of this Complaint.

11         238.   Plaintiffs bring this claim for relief on behalf of themselves and the

12  members of the Class.

13         239.   Defendants' business acts and omissions alleged herein constitute

14  unfair trade practices, in violation of California's Unfair Competition Law, Cal.

15  Bus. & Prof. Code § 17200, et seq., and Cal. Bus. & Prof. Code § 17500, et seq.

16         240.   Defendants' conduct was "unfair" under § 17200 in that the harm to

17  the Plaintiff and the Class outweighs any benefit to Defendants.

18         241.   Defendants' conduct was "fraudulent" under § 17200 in that it is likely

19  to deceive the public.

20         242.   Defendants engaged in false, unfair and misleading business practices,

21  consisting of act and omissions that include, but are not limited to:

22             a.   Defendants' practice of misrepresenting that the timeshare units

23                  were good financial investments;

24             b.   Defendants' failure to disclose to consumers and members of the

25                  Class that the timeshares have a market value far below the

26                  purchase price;

27             c.   Defendants' failure to disclose to consumers and members of the

28                  Class that the five (5) business day cancellation period was not

                                    50

waivable;

    d.  Defendants' practice of using "credits," "equity trade-ins" and "rental credits," as discussed above, falsely represent that the five (5) business day cancellation period could be, and was, waived;

    e.  Defendants' practice of misrepresenting the rental demand for the timeshare units in their advertisements and or their website; and

    f.  Defendants' conduct in violation of Cal. Bus. & Prof. Code § 17500, et seq.

243.  As a direct and proximate result of these acts and omissions, Plaintiffs and the other Class Members allege that the Defendants, and each of them, violated Cal. Bus. & Prof. Code § 17200.

244.  Plaintiffs and the other Class Members suffered monetary injury as a direct result of Defendants' wrongful conduct.

245.  As a result of Defendants' unlawful, unfair, fraudulent and/or deceptive acts and/or omissions, the profits therefrom will not be completely and fully restored to the rightful owners without equitable orders of disgorgement and restitution, and properly determined pursuant to statute, including Cal. Bus, & Prof. Code § 17203, and other applicable law.

246.  Pursuant to Cal. Bus, & Prof. Code § 17203, Plaintiffs and the other Class Members seek a judicial order directing Defendants to restore, to persons in interest, all unlawfully, unfairly, fraudulently and/or deceptively obtained payments for Mayan Resorts timeshares, either as purchase price or maintenance fees, plus interest due thereon at legal rate, and for disgorgement of all other ill-gotten gains.

247.  As a result of Defendants' unlawful, unfair and fraudulent acts and/or omissions, as well as their refusal to acknowledge that such acts and omissions are improper, such conduct will not to be completely and finally curtailed without orders of injunctive nature, as properly determined pursuant to statute and law.

248.   Pursuant to Cal. Bus, & Prof. Code § 17203, Plaintiffs and the other Class Members seek judicial orders of an equitable nature against all Defendants, including, but not limited to, orders declaring such practices as are complained of herein to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions related to Mayan Resorts timeshare units.

## COUNT IV:
## FALSE ADVERTISING
## (Cal. Bus. & Prof. Code § 17500, et seq.)

249.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

250.   Defendants' business acts, false advertisements and materially misleading omissions alleged herein constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code § 17500, et seq.

251.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions that were likely to deceive the public and include, but are not limited to:

252.   Defendants' marketing and promotion of the timeshares constitute misleading, unfair and fraudulent advertising in connection with their efforts to induce consumers to purchase the timeshare units.  Defendants knew or should have known, in the exercise of reasonable care, that the statements they were making were untrue or misleading and did deceive members of the public or were likely to deceive members of the public.

253.   Pursuant, in part, to California Business and Professions Code § 17535, Plaintiffs and the other Class Members seek a judicial order directing

1  Defendants to desist with all false advertising related to the Defendants' illegal

2  pyramid scheme.

3        254.   As a result of Defendants' unlawful, unfair and fraudulent acts and/or

4  omissions, as well as their refusal to acknowledge that such acts and omissions are

5  improper, such conduct will not be completely and finally curtailed without orders

6  of an injunctive nature.

7

8                              **COUNT V:**

9                    **UNFAIR BUSINESS PRACTICES**

10             **(Cal. Bus. & Prof. Code § 17200, et seq.)**

11        255.   Plaintiffs incorporate and adopt by reference the allegations contained

12  in each and every preceding paragraph of this Complaint.

13        256.   Plaintiffs bring this cause of action on behalf of themselves and on

14  behalf of the general public of the State of California as a "private attorney general

15  action" pursuant to California Business and Professions Code § 17203.  The

16  conduct of Defendants as alleged herein has been and continues to be deleterious to

17  the general public and Plaintiffs are seeking to enforce important rights affecting

18  the public interest within the meaning of California Civil Procedure Code § 1021.5.

19  Defendants are engaged in an illegal fraudulent pyramid scheme.

20        257.   Defendants are engaged in ongoing and continuous unlawful, unfair

21  and fraudulent business practices and unfair, deceptive, untrue and misleading

22  advertising within the meaning of California Business and Professions Code §

23  17200.  The acts or practices alleged herein constitute a pattern of behavior,

24  pursued as a wrongful business practice, which has harmed and continues to harm

25  consumers throughout the state of California.  Defendants' wrongful business

26  practices must be enjoined to prevent further harm and deception to California

27  consumers.

28

258.   Pursuant to California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law.

259.   Pursuant to California Business and Professions Code § 17200, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

260.   Pursuant to California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public. Defendants' business practice is fraudulent in that they have deceived the public by misrepresenting the nature of the timeshare contracts.

261.   As a result of Defendants' unlawful, unfair and fraudulent acts and/or omissions, as well as their refusal to acknowledge that such acts and omissions are improper, such conduct will not to be completely and finally curtailed without an injunction.

262.   Pursuant to California Business and Professions Code § 17203, Plaintiffs seek a judicial order of an equitable nature against all defendants, including, but not limited to, an order declaring such practices as are complained of herein to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions related to operating the illegal fraudulent scheme.

## COUNT VI:
## RESCISSION

263.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

264.   Defendants' false advertisements and materially misleading statements and/or omissions alleged herein constitute unfair trade practices and false

advertising, in violation of the California Business and Professions Code § 17500, et seq.

265.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions that were likely to induce consumers to purchase the timeshare units at inflated prices.

266.   Defendants' marketing and promotion of the timeshares constitute misleading, unfair and fraudulent advertising in connection with their efforts to induce consumers to purchase the timeshare units.  Defendants knew or should have known, in the exercise of reasonable care, that the statements they were making were false and misleading.

267.   Defendants' false and misleading statements were made with the intent that Plaintiffs and the members of the class rely on those statements, and Plaintiffs and the members of the class did reasonably rely on those false and misleading statements.

268.   Plaintiffs and the members of the suffered damages as a result of Plaintiffs reasonable reliance on Defendant's fraudulent misstatements and/or omissions, that such acts and omissions are improper.

269.   Plaintiffs, on behalf of themselves and the members of the class, seek rescission of the timeshare contracts, and return of all sums, including purchase price, interest and maintenance fees paid pursuant to that contract.

## COUNT VII:
## COMMON LAW FRAUD

270.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this complaint.

271.   As alleged above, Defendants and their agents made material, false representations to Plaintiffs as to the nature of the timeshare purchase agreements signed and Plaintiffs' rights and obligations thereunder.

272.   When the representations were made, Defendants and their agents either knew they were false or made the representations recklessly, as positive assertions, without knowledge of their truth.

273.   Defendants fully intended that Plaintiffs would act on Defendants' misrepresentations by signing the purchase agreements.

274.   Plaintiffs relied on Defendants' representations in signing the purchase agreements.

275.   Defendants' representations caused damage to Plaintiffs.

## COUNT VIII:

## FRAUD IN THE INDUCEMENT

276.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

277.   As alleged above, Defendants' agents made material, false representations to Plaintiffs as to the terms of the timeshare purchase agreements, leading Plaintiffs to agree to enter into the transactions with false impressions and misunderstanding of the risks, duties and obligations undertaken.

278.   When the representations were made, Defendants and their agents either knew they were false or made the representations recklessly, as positive assertions, without knowledge of their truth.

279.   Defendants fully intended Plaintiffs to act on the misrepresentations by signing the purchase agreements.

280.   Plaintiffs relied on Defendants' representations in signing the purchase agreements.

281.   Defendants' representations caused damage to Plaintiffs.

//

//

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

1

2

**COUNT IX:**

**CIVIL CONSPIRACY TO DEFRAUD**

3      282.   Plaintiffs incorporate and adopt by reference the allegations contained

4  in each and every preceding paragraph of this Complaint.

5      283.   As alleged and detailed above, Defendants conspired to defraud

6  Plaintiffs.  Defendants shared the objective of deceiving, defrauding and

7  fraudulently inducing Plaintiffs to enter into exorbitantly expensive timeshare

8  arrangements; had a meeting of the minds as to how to accomplish that objective;

9  committed unlawful acts of fraud, fraudulent inducement and deception in

10  furtherance of that objective; and injured Plaintiffs as the proximate result of those

11  illegal acts.

12

13

**COUNT X:**

14

**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

15      284.   Plaintiffs incorporate and adopt by reference the allegations contained

16  in each and every preceding paragraph of this Complaint.

17      285.   In entering into purchase agreements for timeshares, Plaintiffs placed

18  special confidence in Defendants, who thereby obtained a superiority of position

19  and influence.

20      286.   This special relationship gave rise to Defendants' duty of good faith

21  and fair dealing toward Plaintiffs.

22      287.   In the days after inception of each purchase agreement, Defendants

23  and their agents failed that duty by misleading Plaintiffs into believing that

24  Plaintiffs could not rescind their purchase agreements during the five days

25  following the inception of each agreement, or that by rescinding they would forfeit

26  their deposit or down payment.

27

28

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

288.   Defendants further failed their duty of good faith and fair dealing by not allowing Plaintiffs to rescind their purchase agreements after Plaintiffs discovered Defendants' fraud and demanded rescission.

289.   Defendants' failure is the proximate cause of each Plaintiff's injuries.

## COUNT XI:

## NEGLIGENCE

290.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

291.   As the owners, operators and managers of the properties visited by Plaintiffs, Defendants Mayan Resorts, Mayan Palace, Daniel Chavez, Daniel Omar, Scott Erikson, and Casey Owens had a duty to prevent their agents and employees from defrauding Plaintiffs and other victims.

292.   As described above, Defendants willfully and knowingly failed to perform that duty, allowing their agents and employees to defraud Plaintiffs and other victims.

293.   As described above, Plaintiffs were injured as a proximate result of that failure.

## COUNT XII:

## GROSS NEGLIGENCE

294.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

295.   Defendants' conduct was negligent as alleged above.

296.   Defendants' conduct was grossly negligent in that Plaintiffs' injuries were the result of Defendants' conscious indifference to Plaintiffs' rights and welfare.

## COUNT XIII:

## NEGLIGENT MISREPRESENTATION

297.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

298.   The misrepresentations were made by Defendants or their agents in the course of their business and in a transaction in which Defendants had a pecuniary interest.

299.   Defendants through their agents willfully and knowingly supplied false information for the guidance of others in their business.

300.   Defendants did not exercise reasonable care or competence in obtaining or communicating the information.

301.   Plaintiffs suffered pecuniary losses by justifiably relying on Defendants' representations.

## COUNT XIV:

## GROSSLY NEGLIGENT MISREPRESENTATION

302.   Plaintiffs incorporate and adopt by reference the allegations contained in each and every preceding paragraph of this Complaint.

303.   Defendants' conduct constituted negligent misrepresentation as alleged above.

304.   Defendants' conduct constituted grossly negligent misrepresentation in that Plaintiffs' injuries were the result of Defendants' conscious indifference to Plaintiffs' rights and welfare.

## REQUEST FOR RELIEF

305.   Plaintiffs repeat and reallege the allegations contained in each and every preceding paragraph of this complaint.

306.   Plaintiffs request that this Court render the following relief:

59

(a)  Grant judgment in favor of Plaintiffs and against Defendants;

(b)  Grant temporary and permanent injunctive relief;

(c)  Declare that Defendants' conduct constitutes violations of the statutes and common law cited herein;

(d)  Award Plaintiffs an appropriate amount in monetary damages as determined at trial, including pre- and post-judgment interest;

(e)  Award Plaintiffs attorneys' fees and the costs of bringing this action;

(f)  Award Plaintiffs treble damages against all defendants, jointly and severally, in an amount in excess of $75,000 to be proven at trial together with prejudgment interest, costs and attorneys' fees;

(g)  Impose exemplary and/or punitive damages against Defendants in an appropriate amount to be determined at trial; and

(h)  Grant Plaintiffs such other relief as is just and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  March 3, 2008

Respectfully submitted,

William A. Isaacson
wisaacson@bsfllp.com
Aaron J. Snow
asnow@bsfllp.com
BOIES, SCHILLER& FLEXNER LLP
5301 Wisconsin Avenue, N.W.,
Suite 800
Washington, D.C.  20015
Phone (202) 237-2727

Kevin J. Barry (CA Bar No. 229748)
kbarry@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA  94612
Phone (510) 874-1000
Fax (510) 874-1460
*Attorneys for Plaintiffs*

60

1   Fax (202) 237-6131

2   Caryl L. Boies (CA Bar No. 153783)
    clboies@bsfllp.com
3   BOIES, SCHILLER & FLEXNER LLP
    401 East Las Olas Boulevard,
4   Suite 1200
    Fort Lauderdale, FL  33301
5   Phone (954) 356-0011
    Fax (954) 356-0022
6
    Lance Lubel
7   Adam Q. Voyles
    avoyles@heardrobins.com
8   HEARD, ROBINS, CLOUD & LUBEL
    LLP
9   500 Dallas, Suite 3100
    Houston, TX  77002
10  Phone (713) 650-1200
    Fax (713) 650-1400
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR MONEY DAMAGES AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

Kevin Barry (CA Bar #229748)
BOIES SCHILLER & FLEXNER
1999 Harrison Street, Suite 900
Oakland CA 94612
telephone: (510)874-1000
fax: (510)874-1460

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Jessica Monugian, Michael Gonzales, Kathleen
Janiec, Gerald Wolke, Feng Yan Wolke, James
Almond, Anna Almond,

PLAINTIFF(S)

v.

See ATTACHMENT A (List of Defendants)

DEFENDANT(S).

CASE NUMBER

**CV08-01497 GAF   AJWx**

SUMMONS

---

TO:    DEFENDANT(S): See ATTACHMENT A (List of Defendants)

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, __William A. Isaacson, Esq.__, whose address is __Boies, Schiller & Flexner, 5301 Wisconsin Avenue NW, Washington, D.C. 20015__. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __MAR  4 2008__

By: _____
        Deputy Clerk

(Seal of the Court)

[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].

**ATTACHMENT A – List of Defendants**

Desarollo Marina Vallarta S.A. de C.V.;
El Grupo Mayan Palace;
Daniel Chavez Moran;
Daniel Omar Chavez;
Scott R. Erikson;
Casey Jon Owens;
Canamere, Inc.;
Huffsmith-Kohrville, Inc.;
Preferred Vacations, Inc.;
Premium Travel Services, Inc.;
Resort Solutions, Inc.;
Seven Oceans US, Inc.;
AZM Marketing, LLC;
Resort Quality Controls, Inc.;
Resort Condominiums International, LLC;
Resorts International Marketing Corp.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>Jessica Monugian, Michael Gonzales, Kathleen Janiec, Gerald Wolke,<br>Feng Yan Wolke, James Almond, Anna Almond | **DEFENDANTS**<br>Desarollo Marina Vallarta S.A. de C.V. et al. |
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):<br>Los Angeles County | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only): |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br>Kevin Barry (CA Bar #229748), BOIES SCHILLER & FLEXNER<br>1999 Harrison Street, Suite 900<br>Oakland, CA 94612<br>telephone: (510)874-1000 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding     ☐ 2 Removed from State Court     ☐ 3 Remanded from Appellate Court     ☐ 4 Reinstated or Reopened     ☐ 5 Transferred from another district (specify):     ☐ 6 Multi-District Litigation     ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. 1331, 28 U.S.C. 1332(a)(1)-(2) diversity jurisdiction. Plaintiffs allege defendants engaged in fraud and misrepresentation (and other causes of action), in violation of various federal and state statutes, including 19 U.S.C. 1961, and CA Bus. and Prof. Code section 17200 et seq, 17500 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| | | | | | |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☑ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities /Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Act<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Info. Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes | **CONTRACT**<br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise<br>**REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **TORTS**<br>**PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Fed. Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury-Med Malpractice<br>☐ 365 Personal Injury-Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability | **TORTS**<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability<br>**BANKRUPTCY**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 445 American with Disabilities - Employment<br>☐ 446 American with Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence Habeas Corpus<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus/Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>**FORFEITURE/PENALTY**<br>☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety /Health<br>☐ 690 Other | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No  ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:**     Case Number: _____

CV-71 (07/05)                    CIVIL COVER SHEET                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑ No   ☐ Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or

☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)

☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

Jessica Monugian (Los Angeles County), Michael Gonzales (Los Angeles County), Kathleen Janiec (Orange County), Gerald Wolke (Solano County), Feng Yan Wolke (Solano County), James Almond (Sacramento County), Anna Almond (Sacramento County)

List the California County, or State if other than California, in which EACH named defendant resides.  (Use an additional sheet if necessary).

☐ Check here if the U.S. government, its agencies or employees is a named defendant.

Desarollo Marina Vallarta S.A. de C.V.  (Mexico), El Grupo Mayan Palace (Mexico), Daniel Chavez Moran (Arizona), Daniel Omar Chavez (Arizona), Scott R. Erikson (Texas), Casey Jon Owens (Arizona), Canamere, Inc. (Texas), Huffsmith-Kohrville, Inc. (Texas), Preferred Vacations, Inc. (Texas), Premium Travel Services, Inc. (Texas), Resort Solutions, Inc.  (Arizona), Seven Oceans US, Inc. (Arizona), AZM Marketing, LLC  (Arizona), Resort Quality Controls, Inc. (Texas), Resort Condominiums International, LLC (New Jersey), Resorts International Marketing Corp. (Florida)

List the California County, or State if other than California, in which EACH claim arose.  (Use an additional sheet if necessary)

**Note:** In land condemnation cases, use the location of the tract of land involved.

Count I, Count II, Count III, Count IV, Count V, Count VI, Count VII, Count VIII, Count VIIII, Count X - Los Angeles County, Orange County, Solano County, Sacramento County, Texas, Mexico.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date _____ March 3, 2008

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Gary A. Feess and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV08- 1497 GAF (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY